☑ Original ☐ Du


CLERK'S OFFICE
A TRUE COPY
Aug 21, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) Case No. **24-M-475 (SCD)** |
| Information associated with the Facebook user ID: | ) |
| "10150258843490602", (user name "Jessica Friday") that is stored | ) |
| at premises owned, maintained, controlled, or operated by Meta | ) |
| Platforms, Inc., a company headquartered in Menlo Park, California. | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____

*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before      9-4-24 _____ *(not to exceed 14 days)*

☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Hon. Stephen C. Dries _____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     8-21-24. 1:50 pm _____          *Stephen C. Dri* _____

*Judge's signature*

City and state:   Milwaukee, WI _____     Honorable Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID: "10150258843490602", (user name "Jessica Friday") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

# ATTACHMENT B

## Particular Things to be Seized

**I.    Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information associated with **the user ID listed in Attachment A for the time period of January 1, 2019 to the date of this warrant's execution**:

(a)    All contact and personal identifying information, for the accounts in Attachment A including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including

the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user including all Messenger activity, private messages, disappearing messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

3

## II.    Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 843 involving Jessica Friday (the Facebook account owner and suspect) since January 1, 2019, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a) Communications regarding the issuance of prescriptions, the discussion and arrangement of the distribution, sale and/or trade of controlled substances between said suspects and potential communications with other sources regarding controlled substances.

(b) Evidence indicating FRIDAY's knowledge of the standards for controlled-substance prescribing and/or her provision of medical care, advice, or direction via the platform;

(c) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

4

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin



CLERK'S OFFICE
A TRUE COPY
Aug 21, 2024
s/ JDH
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Information associated with the Facebook user ID: "10150258843490602", (user name "Jessica Friday") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

)
)
)
)
)
)

Case No. **24-M-475 (SCD)**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Unlawful distribution of controlled substances outside the scope of normal medical practice and not for legitimate medical purpose; Acquiring possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge |
| 21 U.S.C. § 843(a)(3) | |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

TYLER OWENBY  Digitally signed by TYLER OWENBY
Date: 2024.08.20 14:38:16 -05'00'

*Applicant's signature*

Tyler F. Owenby, Special Agent DEA

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means)*.

Date: 8-21-24.

*Judge's signature*

City and state: Milwaukee, WI

Stephen C. Dries, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Kerrianne Sundberg, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND INVESTIGATOR BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook accounts that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession pertaining to the subscribers or customers associated with the Facebook user name "Jessica Friday," user ID "10150258843490602."

2.      I am a Diversion Investigator with the Drug Enforcement Administration ("DEA"). I have been so employed since January 2019 and am currently assigned to the DEA Milwaukee District Office.  As part of my duties as a DEA Diversion Investigator, I investigate criminal violations involving Title 21, United States Code, and Title 21, Code of Federal Regulations, Part 1300 et seq. In my capacity as a Diversion Investigator, I have conducted and participated in investigations of practitioners, pharmacies and individuals involved in diversion, that is, the unlawful distribution and acquisition of pharmaceutical controlled substances. I am familiar with the usual methods of investigation, including but not limited to, conducting audits, the questioning of witnesses, the use of informants, undercover operations and the review of social media platforms and phone records for communication.

3.     I have participated in complex investigations which involved violations of state and federal controlled substances laws including Title 21, United States Code, Sections 841(a)(1) and 843(a)(3).

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, law enforcement officers and witnesses, DEA records, and records and information received from other parties, such as victims and pharmacists. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.     Based on the facts set forth in this affidavit, there is probable cause to believe that Jessica Friday was involved in the unlawful distribution of controlled substances outside the scope of normal medical practice and not for a legitimate medical purpose, in violation of Title 21, United States Code, Sections 841(a)(1) and 843(a)(3) (to acquire possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge). There is also probable cause to search the information described in Attachment A for evidence of these crimes as described in Attachment B.

**PROBABLE CAUSE**

6.     I am conducting an investigation of Jessica Friday ("FRIDAY"), for her suspected involvement in the unlawful distribution of controlled substances outside the scope of normal medical practice and not for legitimate medical purposes, in violation of Title 21, United States Code, Section 841(a)(1), and acquiring possession of a controlled substance by misrepresentation, fraud, forgery, deception, or subterfuge, in violation of Title 21, United States Code, Section 843(a)(3).

2

7.      FRIDAY is a Mid-Level Practitioner (Nurse Practitioner) licensed to practice medicine in the state of Wisconsin. FRIDAY maintains DEA Registration Number MF5105146, registered at 3815 Stoney Creek Court, Appleton, Wisconsin 54913, which authorizes FRIDAY to issue Schedules II-V controlled substance prescriptions in Wisconsin. Investigation in this case has revealed the aforementioned address is FRIDAY's home address. I am familiar with the facts and circumstances regarding this investigation as a result of my personal participation in this investigation and my review of: (a) records pertaining to DEA Registration MF5105146 (b) Wisconsin Prescription Drug Monitoring Program ("PDMP") records (c) reports prepared by, and information obtained from, other federal, state, and local law enforcement agents and officers, all of whom I believe to be truthful and reliable; and (d) information obtained from cooperating citizen witnesses.

8.      Pursuant to Title 21, United States Code, Section 841(a)(1) and Title 21, Code of Federal Regulations, Section 1306.04(a), the distribution of controlled substances is unlawful unless the controlled substances are issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his or her professional practice. The practitioner is responsible for the proper prescribing and dispensing of controlled substances. Based on information received from victims, prescribing databases and prescription images, there is probable cause to believe that FRIDAY has issued controlled substance prescriptions, and continues to prescribe controlled substances outside of the usual course of professional practice, and that she issued controlled substance prescriptions to at least one patient with an agreement that she would receive a portion of the controlled substances back from the patient once the prescription was filled at the pharmacy.

*Background*

9.      FRIDAY became registered with the DEA in January 2019. FRIDAY maintained Wisconsin Registered Nurse (license 222309-30) and Advanced Practice Nurse Practitioner (license 8937-33) licenses which were both regular and active with no disciplinary orders documented. FRIDAY's Advanced Practice Nurse Prescriber license listed a specialty in Family Practice.

10.     FRIDAY was employed by American Telepsychiatry as a Nurse Practitioner. According to American Telepsychiatry's website, https://atelepsych.com, FRIDAY specialized in psychiatry, adult psychiatry and family practice. American Telepsychiatry's website stated American Telepsychiatry, American Behavioral Telehealthcare and American Telehealthcare were trademarks owned by Horizon Healthcare, Inc., a Wisconsin corporation organized in May 1990. American Telepsychiatry utilized telemedicine as part of their practice.

11.     Prior to American Telepsychiatry, FRIDAY was employed at Apple Medical Clinic, located in Appleton, Wisconsin. She was employed by Apple Medical Clinic from January 2019 until November 2020. This was a pain management clinic that utilized electrical therapy for pain management.

*Information Obtained from PDMP Database*

12.     As part of my investigation, I reviewed data contained within the Prescription Drug Monitoring Program, commonly referred to as "PDMP" (see Wis. Stat. §450.19). As a Diversion Investigator, I use the PDMP to review prescriptions of controlled substances issued and dispensed by DEA registrants and filled by individual persons of interest. The Pharmacy Examining Board ("PEB") governs the PDMP, and the Wisconsin Department of Safety and Professional Services

4

("DSPS") oversees the operation of the PDMP in accordance with the policies established by the PEB.

13.     A review of FRIDAY's PDMP records revealed the majority (approximately 63%) of the controlled substances she issued were stimulants, followed by benzodiazepines (18%). Of all the controlled substances she issued, opioids were the least (6%). Five of FRIDAY's prescriptions were for a combination of an opioid, benzodiazepine, and carisoprodol (muscle relaxer). This combination is frequently referred to as the "Holy Trinity." The Holy Trinity is a dangerous combination because it is known to depress the central nervous system and ability to breathe, which causes an increased risk of overdose and death.

14.     During her employment at Apple Medical Clinic, FRIDAY issued approximately 78 controlled substance prescriptions to approximately Fifteen (15) different individuals. Included in these were prescriptions issued to individuals identified as FRIDAY's mother and stepfather. A subsequent review of records from Apple Medical revealed eight (8) of the individuals to whom FRIDAY issued controlled substance prescriptions while employed at Apple Medical were not patients of Apple Medical. FRIDAY's mother and stepmother were, for example, not patients of Apple Medical. These 78 prescriptions were either issued on Apple Medical prescription pads or electronically with Apple Medical Clinic's address listed as the clinic. As explained below, Apple Medical did not use controlled substances as part of their treatment program, which means that all 78 controlled substance prescriptions issued by FRIDAY on Apple Medical prescription paper are potentially problematic.

5

*Controlled Substance Information*

15.     Schedule II controlled substances are those that have a "high potential for abuse" which "may lead to severe psychological or physical dependence," 21 U.S.C. §812(b)(2). Schedule II controlled substances are the most dangerous drugs that can be prescribed for medical use. See 21 U.S.C. §§812(a)(1)(B) and (C) (defining Schedule I controlled substances as having "no currently accepted medical use in treatment in the United States" and lacking "accepted safety…under medical supervision"); 21 U.S.C. §§812(b)(3)(A), (4)(A), and (5)(A) (defining controlled substances in Schedules III, IV and V as having lower potential for abuse than Schedule II controlled substances).

16.     Because Schedule II controlled substances have a high potential for abuse, Congress has enacted special statutes and regulations governing prescriptions for these drugs. For example, except in emergency situations, or when administered directly to a patient by a "practitioner," Schedule II controlled substances can be dispensed only with a "written prescription of a practitioner," 21 U.S.C. §829(a). In addition, "no prescription for a controlled substance in Schedule II may be refilled." For the distribution of a controlled substance to be authorized by law, it must be prescribed "for legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. §1306.04(a).

17.     Opioid medications such as Oxycodone and Hydromorphone are Schedule II controlled substances. Because of the dangers associated with Opioids, the Centers for Disease Control (CDC) have issued guidance related to those classes of drugs. One such set of guidance documents refers to Morphine Milligram Equivalent (MME). MME measures an opioid dosage's equivalency to morphine. The CDC recommends that MME should not exceed 90 MME/day unless necessary with careful consideration and justification (www.cdc.gov).

6

18.     Oxycodone is a Schedule II controlled substance used to treat moderate to severe pain. It has a high risk for addiction and dependence. It can cause respiratory distress and death when taken in high doses or when combined with other substances.

19.     Hydromorphone is a Schedule II controlled substance used to treat moderate to severe pain. It has a high risk for addiction and dependence. It can cause respiratory distress and death when taken in high doses or when combined with other substances.

20.     Vyvanse is a Schedule II controlled substance, generic name lisdexamfetamine-dimesylate. Vyvanse is a central nervous system stimulant that affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control. Vyvanse is used to treat ADHD. Vyvanse may be habit-forming, and this medicine is a drug of abuse.

21.     Carisoprodol is a Schedule IV controlled substance used to treat pain and stiffness from muscle spasms. It is a muscle relaxer that blocks pain sensations between the nerves and the brain. Carisoprodol may be habit forming and should only be used for short periods of time.

*Complaint Information*

22.     In 2021, DEA received a complaint from Appleton Police Department.  It stated that FRIDAY was allegedly writing controlled substance prescriptions to family members, including her mother and stepfather. At the time DEA received that complaint, DEA forwarded the information to the Wisconsin Department of Safety and Professional Services ("DSPS").

23.     In January 2024, DEA received a complaint from local pharmacist, M.R., that she noticed suspicious prescribing from Jessica FRIDAY. According to M.R., FRIDAY prescribed large quantities of controlled substances to patient M.H. (date of birth 07/30/1993) and M.R. felt those prescriptions may be outside the scope of FRIDAY's practice, given the quantity of opioids over a short period of time. M.R. filled oxycodone prescriptions issued by FRIDAY for M.H.

7

beginning approximately August 2023. Around December 2023, FRIDAY increased the quantity of oxycodone tablets prescribed to M.H. In February 2024, FRIDAY increased the strength of the oxycodone prescriptions. The diagnosis FRIDAY wrote on the prescriptions was for "chronic pain syndrome" and "lower back pain." M.H. also regularly filled prescriptions for Vyvanse that were issued by FRIDAY. M.R. expressed a concern that FRIDAY worked in psychiatric medicine but was prescribing opioids.

24.    In reference to M.R.'s complaint, I reviewed the PDMP records of controlled substance prescribing to M.H. According to the PDMP, between March 2022 and January 2024, M.H. filled approximately 47 controlled substance prescriptions issued by FRIDAY. Regular monthly prescriptions were filled for Vyvanse and oxycodone. The oxycodone prescriptions were initially issued for 5mg strength tablets at a quantity of 42 tablets for a seven-day supply, and increased to 20mg tablets at a quantity of 240 tablets for a 14-day supply. In the latter several months, M.H.'s oxycodone prescriptions were filled between two and four days early. M.H.'s most recent prescription MME) was calculated to be 240 MME/day.

25.    After receiving M.R.'s complaint, and reviewing the 2021 complaint, I obtained from various pharmacies images of prescriptions issued by FRIDAY between 2019 and 2021. The majority of these were paper prescriptions and were issued during the period FRIDAY was employed at Apple Medical Clinic. These prescriptions included those filled for the individuals identified as FRIDAY's mother and stepfather, as well as others who were not patients of Apple Medical. The images revealed Apple Medical Clinic's name and address on the top of the paper prescription. Each contained the signature of "Jessica Friday." The majority of the prescriptions were hand-written. The prescriptions issued to FRIDAY's mother and stepfather included monthly oxycodone prescriptions. In March 2024, I spoke with the owner of Apple Medical Clinic, M.J. .

8

M.J. stated FRIDAY was employed at the clinic from January 2019 until November 2020. She was employed as a Nurse Practitioner with no specific specialty. The clinic was a pain management clinic that utilized electrical therapy. M.J. informed me that Apple Medical did not utilize controlled substances as part of their treatment. M.J. stated that FRIDAY often reported to work late, left work early, and took many sick days. FRIDAY was behind in completing documentation in over 1,000 patient charts and was ultimately terminated. Approximately five months after FRIDAY's termination, M.J. received multiple phone calls from a pharmacist stating he received prescriptions for controlled substances that were issued by FRIDAY on Apple Medical Clinic prescription paper. M.J. called FRIDAY on the telephone and informed her to stop using the clinic's prescription paper. M.J. believed FRIDAY took paper prescription pads from the clinic when she was terminated. M.J. stated that FRIDAY would have no need to write prescriptions for controlled substances as part of her employment with Apple Medical because Apple Medical did not utilize controlled substances for their treatment.

26.     In June 2024, I received intelligence that Fox Crossing Police Department (Wisconsin) received a complaint that FRIDAY overprescribed and diverted controlled substances. The investigator informed me that a physician contacted the police department after a patient, J.C., expressed concerns for his safety due to being prescribed a large amount of opioids by FRIDAY, his telehealth provider. I utilized law enforcement databases to obtain J.C.'s criminal history. The review revealed J.C. was found guilty of Disorderly Conduct (two counts), Criminal Damage to Property and Attempt Obtain a Prescription Drug with Fraud in 2012; and Computer-Crime Access Data, Computer Crime-Destroy Equipment and Misappropriate ID Info-Obtain Money in 2013.

9

27. In July 2024, investigators conducted a voluntary interview with J.C. J.C. stated his treatment with FRIDAY began around 2021 or 2022 and he stopped seeing her approximately two months ago, after he had a conversation with his Primary Care Physician about being overprescribed controlled substances. J.C. stated that FRIDAY prescribed pain medication for several toe surgeries. J.C. also stated that FRIDAY treated him for Attention-Deficit-Disorder (ADD), Bipolar, and anxiety, among other conditions. J.C. disclosed to me that he had an overdose of opioid medications several years prior.

28. According to J.C., FRIDAY provided him written instructions to "pre-medicate" 15-20 minutes before their scheduled telehealth visits by taking Xanax and oxycodone.

29. Although FRIDAY was J.C.'s telehealth provider, J.C. indicated that he traveled to FRIDAY's residence approximately 18 times to help her with her computer, television, and sometimes to drop off controlled substance medications that she prescribed to him. J.C. stated that he had an agreement with FRIDAY that he would provide her with half of the pain pills she prescribed to him throughout the 2023-2024 time period during which she prescribed him controlled substances.

30. J.C. stated that he and FRIDAY often met in the Starbucks parking lot near the pharmacy where J.C. filled the prescriptions. In the parking lot, J.C. would get into FRIDAY's vehicle or FRIDAY would get into his vehicle, at which point FRIDAY would count the pain pills J.C. had just picked up from the pharmacy. FRIDAY kept half of the pain pills for herself and gave the remainder to J.C. FRIDAY often changed J.C's medications or changed the strengths of the medications. According to J.C., FRIDAY made these changes to avoid arousing the pharmacy's suspicions about the prescriptions. Sometimes, J.C. gave FRIDAY a portion of the Vyvanse

10

medication she prescribed to him. J.C. understood that FRIDAY used that medication as well. According to J.C., FRIDAY told J.C. she would write him any prescription he wanted.

31.     J.C. told investigators that he and FRIDAY used Facebook messenger to communicate. He explained that they discussed his prescriptions and his providing FRIDAY with portions of his prescribed medications over that communication platform. According to J.C., he and FRIDAY often used code words when discussing the prescriptions on Facebook. He explained that "pink" referred to 10mg oxycodone, "gray" referred to 20mg oxycodone and "white" referred to hydromorphone. J.C. stated that FRIDAY would often remind J.C. when it was time for a prescription refill, and that she began referring to a "yoda" to mean she wanted half of the medication she prescribed him.  J.C. disclosed to me that he had an overdose of opioid medications several years prior.

32.     J.C. provided some documentation of the above-described Facebook messages and text messages he exchanged with FRIDAY. According to J.C., he saved only some of these messages.

33.     In reviewing the messages provided by J.C., I observed conversations about the prescriptions FRIDAY issued to J.C., including discussions about the strength of prescriptions, the quantities that would be prescribed, and which pharmacy to send them to. The messages also discussed how many pills FRIDAY would receive from J.C. There were messages in which FRIDAY asked J.C. if he had any extra pills that she could have. In some instances, FRIDAY explained wanting the controlled substances because she had an eventful weekend coming up with hockey practice, or because she was moving. In one instance, FRIDAY referenced wanting the controlled substances because her husband or children destroyed her supply of medications.

34.     My review of the messages provided by J.C. also revealed instances in which J.C. suggested changes to his prescriptions. In some instances, these suggestions appeared based on a desire to avoid scrutiny by the pharmacy or a desire to "protect" FRIDAY and her license. I also observed messages in which J.C. requested prescriptions. Although the messages did not express J.C.'s concern for his own safety, as he relayed to his primary care provider, the messages corroborated J.C.'s statements that he provided a portion of his controlled substance prescriptions to FRIDAY, that she requested he do so, and that they used coded language to refer to particular types of controlled substances.

35.     According to the PDMP for J.C. between December 2021 and June 2024, he filled approximately 266 controlled substance prescriptions issued by FRIDAY, including multiple prescriptions deemed as the "Holy Trinity."

36.     Approximately 70 of the prescriptions issued by FRIDAY to J.C. were for opioids. J.C. filled approximately 10-15 prescriptions issued by FRIDAY each month. Those prescriptions included, but were not limited to, prescriptions for oxycodone, hydromorphone, alprazolam, diazepam, carisoprodol, lisdexamfetamine-dimesylate and pregabalin. There were numerous early fills and dosage-strength changes. The MMEs for J.C. varied each month because the prescriptions changed. At one point, J.C.'s MME was as high as 689 MME/day.

37.     Based on my training and experience, and my review of the communications between J.C. and FRIDAY, there is probable cause to believe that FRIDAY's Facebook records contain evidence of the unlawful distribution of controlled substances.

12

## BACKGROUND CONCERNING FACEBOOK

38.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

39.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

40.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

41.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these

13

privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

42.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

43.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

44.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

14

45.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats of the date of each call.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

46.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

47.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

48.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

49.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

50.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

51.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user

15

accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

52. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

53. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

54. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

55. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is

16

analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

56.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

17

**INFORMATION TO BE SEARCHED**

57.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

**CONCLUSION**

58.     Based on the foregoing, I request that the Court issue the proposed search warrant.

59.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

60.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the U.S. District Court for the Eastern District of Wisconsin "a district court of the United States that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

I swear under penalty of perjury that the foregoing is true and correct.

KERRIANNE SUNDBERG
Digitally signed by KERRIANNE SUNDBERG
Date: 2024.08.21 15:03:23 -05'00'

Kerrianne Sundberg
Diversion Investigator, Drug Enforcement Administration

18

Sworn by the affiant in accordance with the requirements
of Fed. R. Crim. P. 4.1 by telephone on this 21st day of August, 2024.

_____
STEPHEN C. DRIES
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF WISCONSIN

19

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the Facebook user ID: "10150258843490602", (user name "Jessica Friday") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

20

## ATTACHMENT B

### Particular Things to be Seized

**I.** **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information associated with **the user ID listed in Attachment A for the time period of January 1, 2019 to the date of this warrant's execution**:

(a) All contact and personal identifying information, for the accounts in Attachment A including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including

21

the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user including all Messenger activity, private messages, disappearing messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

22

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

23

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 843 involving Jessica Friday (the Facebook account owner and suspect) since January 1, 2019, including, for each user ID identified on Attachment A, information pertaining to the following matters:

    (a) Communications regarding the issuance of prescriptions, the discussion and arrangement of the distribution, sale and/or trade of controlled substances between said suspects and potential communications with other sources regarding controlled substances.

    (b) Evidence indicating FRIDAY's knowledge of the standards for controlled-substance prescribing and/or her provision of medical care, advice, or direction via the platform;

    (c) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

    (d) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

    (e) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

24